**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Sheldon C. G. HELSLEY, Orville B.
Jones and Jerry A. Shipman,
Defendants-Appellees.**

**No. 79–1100.**

United States Court of Appeals,
Ninth Circuit.

Nov. 16, 1979.

Robert L. Zimmerman, Asst. U. S. Atty., Billings, Mont., Daniel K. Mayers, Washington, D. C., on brief, James W. Moorman, Asst. Atty. Gen., Washington, D. C., for plaintiff-appellant.

Blair Jones, Willis B. Jones, Billings, Mont., for defendants-appellees.

Before MERRILL and KENNEDY, Circuit Judges, and WILLIAMS,* District Judge.

KENNEDY, Circuit Judge:

This appeal by the United States presents the question of the constitutionality of the Airborne Hunting Act of 1971, Pub.L.No. 92–159, 85 Stat. 480 (codified at 16 U.S.C. § 742j–l (1976)). The appellees were charged with shooting a coyote from an aircraft in violation of the Act. The United States District Court for the District of Montana found the Act unconstitutional as "an impermissible and invalid preemption of a regulatory power plainly reserved to the states," 463 F.Supp. 1111, 1113 (D.Mont.1979) and dismissed the charges. Because it was error to hold the act unconstitutional, we reverse.

The commerce clause of the Constitution, art. I, section 8, clause 3, is fully sufficient to empower Congress to enact the statute and to sustain its enforcement against these appellees. The Congress has declared its authority over national air space by enacting the following provision in Section 1108(a) of the Federal Aviation Act of 1958, Pub.L.No.85–726, 72 Stat. 731, 798:

> The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the airspace of the United States, including the airspace above all inland waters and the air space above those portions of the adjacent marginal high seas, bays, and lakes, over which by international law or treaty or convention the United States exercises national jurisdiction.

49 U.S.C. § 1508(a). The authority for this enactment rests on the commerce clause. *See City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 626–27, 93 S.Ct.

1854, 36 L.Ed.2d 547 (1973); *Braniff Airways v. Nebraska Board*, 347 U.S. 590, 596, 74 S.Ct. 757, 98 L.Ed. 967 (1954); *World Airways, Inc. v. International Brotherhood of Teamsters*, 578 F.2d 800, 803 (9th Cir. 1978); *Feldman v. Philadelphia National Bank*, 408 F.Supp. 24, 36 (E.D.Pa.1976). We think the federal power to regulate the air space is as complete and as valid as the federal power, to the extent it rests upon the commerce clause, to regulate navigable waters. *See The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870).[1] Acting pursuant to this power, the federal government has imposed controls on all phases of aircraft operations. *See, e. g.,* 49 U.S.C. § 1421(a)(1) (standards for aircraft design and construction); *id.* § 1421(a)(3) (aircraft inspection); *id.* § 1472(1)(*l*) (regulating transport of weapons and explosives); 14 C.F.R. § 91.9 (prohibiting careless or reckless operation of aircraft); *id.* § 91.70 (safe speeds); *id.* §. 137 (rules for agricultural aircraft operation); *id.* § 91.13 (prohibiting dropping objects from aircraft which create hazard). The Airborne Hunting Act is a statute enacted for a similar purpose and it is well within the congressional power to regulate interstate commerce.

The authority we cite above is all that is necessary to sustain the validity of the Act, but in view of the arguments that were advanced by the appellees, and apparently accepted by the district court, a further, brief comment is appropriate. It was held below that the federal statute was an attempt to regulate game management and therefore that it must fall since that subject has been "preempted" by the state. The premise is erroneous, and even if it were correct the Supreme Court has made it clear that the federal power over commerce cannot be limited by such dialectics.

---

* Honorable David W. Williams, United States District Judge for the Central District of California, sitting by designation.

1. In reporting the bill which became the Air Commerce Act, the Congress said:

The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or

nonnavigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil.

H.R.Rep.No.572, 69th Cong., 1st Sess., p. 10.

■ In passing the Airborne Hunting Act, Congress acted with an express purpose to regulate for the safety of the national air space. *See* S.Rep.No.92–421, 92d Cong., 1st Sess., *reprinted in* [1971] U.S. Code Cong. & Admin.News, p. 1735. There was evidence before Congress of danger to safety resulting from hunting by aircraft, including reference to property damage and at least one death from a mid-air collision between planes engaging in such hunting. *See* Hearings Before the Subcommittee on Fisheries and Wildlife Conservation of the House Committee on Merchant Marines and Fisheries, 92d Cong., 1st Sess. 9, 38–43 (1971). When acting to promote safety in an artery of commerce, Congress may choose any means that is reasonably adopted to the end.

Congress is empowered to regulate,— that is, to provide the law for the government of interstate commerce; to enact 'all appropriate legislation' for its 'protection and advancement' (*The Daniel Ball*, 10 Wall. 557, 564, [19 L.Ed. 999]); to adopt measures 'to promote its growth and insure its safety' (*County of Mobile v. Kimball*, [102 U.S. 691, 26 L.Ed. 238] *supra* ); 'to foster, protect, control and restrain' (*Second Employers' Liability Cases*, [*Mondou v. N. Y., N. H. & H. R. Co.*, 223 U.S. 1, 32 S.Ct. 169, 56 L.Ed. 327] *supra* ).

*Shreveport Rate Case*, 234 U.S. 342, 351, 34 S.Ct. 833, 836, 58 L.Ed. 1341 (1914).

■ Even if we should find it appropriate to ascribe a dominant purpose to the statute and should further conclude that this purpose was to regulate game management (and we neither assert that authority here nor make the finding), nevertheless, congressional regulation is not thwarted by arguments that the incidental connection between commerce and the regulation is used merely as an expedient to justify the law. The power to regulate commerce is plenary, *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), and once the power exists it is for Congress, not the courts, to choose the ends for which its exercise is appropriate. This proposition has not always found judicial acceptance, but it has been the prevailing rule at least since 1941 when the Supreme Court overruled *Hammer v. Dagenhart*, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101 (1918) in the leading case of *United States v. Darby*, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). It is established that Congress may choose the commerce clause as the means to eradicate racial discrimination in the provision of or access to interstate goods, *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964), or that a transaction which is essentially local may be regulated when it, taken together with all similar incidents, has a cumulative effect on interstate commerce, *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), or that Congress may find that a class of activities affects interstate commerce and thus regulate or prohibit all such activities without the necessity of demonstrating that the particular transaction in question has an impact which is more than local. *Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971). These precedents lay to rest any argument that Congress exceeded its authority here. Whatever small residuum of power the courts may retain to confine the permitted objects of congressional power under the commerce clause, most emphatically it would be improper to exercise the power in this case where the nexus between interstate commerce and the conduct subject to the regulation is so close.

■ Finally, the proposition that certain acts of the state government are reserved from congressional regulation, *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), is inapplicable here. The Airborne Hunting Act regulates private conduct, not the functions of a state acting in its political capacity. *See Hyland v. Fukada*, 580 F.2d 977, 981 n.5 (9th Cir. 1978). The federal act does not impair state sovereignty in any aspect which is reserved exclusively to the states. Appellees and the district court rely on *Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896) to support the argument that the inherent police power of

the states enables the states exclusively to regulate wildlife within their boundaries. *Geer,* which had been called into serious question by recent Supreme Court decisions, was finally overruled last Term in *Hughes v. Oklahoma,* 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979). Even prior to *Hughes,* the Supreme Court made clear that "the states' control over wildlife is not exclusive and absolute in the face of federal regulation." *Baldwin v. Montana Fish and Game Commission,* 436 U.S. 371, 386, 98 S.Ct. 1852, 1861, 56 L.Ed.2d 354 (1978). A state's control over its resources, including wildlife, does not prohibit the proper exercise of federal power under provisions such as the commerce clause. *Id.; Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 285, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977); *Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976); *Missouri v. Holland,* 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920).

■ Based on the principles set forth above, we doubt that state legislation could stand even if it were expressly contrary to the federal scheme, but no such conflict is presented for our review on the facts of this case. Congressional power here was exercised with sensitivity for state interests. There is a specific incorporation of state programs into the framework of the federal act. *See* 16 U.S.C. § 742j–1(b) (exempting state officials and those to whom state grants permit); *id.* § 742j–1(d) (authorizing Secretary of Interior to delegate enforcement authority to state officials). We find no conflict between Montana law and the Airborne Hunting Act. Montana law provides that the State Department of Livestock shall control the destruction of wild animals, including coyotes, pursuant to rules promulgated by the department. Mont.Rev.Code Ann. §§ 46–1903, 1912. The Department's aerial hunting rules, by their own description, were "designed to meet the requirements of 16 U.S.C. 742j–1." Mont.Regs. § 32–2.14(1)–S1400. In addition to requiring compliance with federal aviation regulations, Montana requires a state permit and limits aerial hunting to coyotes and foxes and then "only for the protection of livestock, domestic animals or human life." *Id.* § 32–2.14(1)–S1420. The Montana enactments are parallel to the federal law, not antithetical to it.

There are other federal powers which may provide further foundation for enactment of the congressional statute, but it is unnecessary for us to discuss those points since we sustain the Act under the commerce clause.

REVERSED.