ENRIQUE MOLINA–ESTRADA, et al., Plaintiffs, Appellants,

v.

PUERTO RICO HIGHWAY AUTHORITY, Defendant, Appellee.

No. 81–1447.

United States Court of Appeals, First Circuit.

Argued Feb. 2, 1982.

Decided June 8, 1982.

Nicolas Delgado Figueroa, Santurce, P. R., for plaintiffs, appellants.

Lorraine Riefkohl de Lopez, Asst. Sol. Gen., Dept. of Justice, San Juan, P. R., with whom Hector A. Colon Cruz, Sol. Gen., San Juan, P. R., was on brief, for defendant, appellee.

Before GIBSON,* BOWNES and BREYER, Circuit Judges.

BREYER, Circuit Judge.

Appellants are "irregular employees" of the defendant, the Puerto Rico Highway Authority. They work on highway construction projects and "highway upkeep." They sued the Authority for additional wages that they believe were owed to them under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, or the Davis-Bacon Act, 40 U.S.C. § 276a *et seq.* (applied through the Federal Aid Highway Act of 1956, 23 U.S.C. § 113(a)). The district court dismissed their complaint on two grounds. First, it viewed the Authority as the *alter ego* of the Commonwealth itself. It consequently considered the suit barred by the Eleventh Amendment to the Constitution. ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, ...") The constitutional principle underlying the Eleventh Amendment also forbids a state's own citizens to bring against it in federal court an unconsented suit for damages. *See Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Employees v. Department of Public Health and Welfare of*

*Missouri*, 411 U.S. 279, 280, 93 S.Ct. 1614, 1615, 36 L.Ed.2d 251 (1973); *Ezratty v. Commonwealth of Puerto Rico*, 648 F.2d 770, 776 n.7 (1st Cir. 1981) (principles underlying the Eleventh Amendment are applicable to Puerto Rico). Second, it considered the Authority to be engaged in "integral operations in areas of traditional governmental functions" and therefore immune from federal "minimum wage" regulation under the principle of *National League of Cities v. Usery*, 426 U.S. 833, 852, 96 S.Ct. 2465, 2474, 49 L.Ed.2d 245 (1976).

In this court the appellants argue only one issue: whether the Authority's statutory powers to operate a mass transportation system, rent parking lots, and charge a fee for the use of its highways, place it outside the *National League of Cities* principle. Their brief, in its statement of issues, refers to "jurisdiction" and the Davis-Bacon Act, but it makes no Davis-Bacon Act or Federal Aid Highway Act argument. It argues only whether the Puerto Rico Highway Authority "is acting as a private corporation and should be treated as such."

Before approaching that issue, however, we consider as a preliminary matter the Authority's claim that we ought not to reach the *National League of Cities* question. In the Authority's view, a suit against it is barred by the Eleventh Amendment and related sovereign immunity doctrine. This question is difficult. The Supreme Court has specifically held that a state can assert an Eleventh Amendment-type defense to an FLSA suit, but its holding seems based in part on its conclusion that Congress had not shown in the statute a specific intent that the state's sovereign immunity be "waived" (*i.e.*, overridden). *Employees v. Department of Public Health and Welfare of Missouri*, 411 U.S. at 283–85, 93 S.Ct. at 1617–18. Congress responded to the *Employees* opinion by enacting a statute specifically seeking to override the states' sovereign immunity. Fair Labor Standards Amendments of 1974, Pub.L.No. 93–259, § 6(d)(1), 88 Stat. 55 (amending 29 U.S.C. § 216); *see* 29 U.S.C.A. § 216 (Supp.

---

* Of the Eighth Circuit, sitting by designation.

1982). *See also* H.R.Rep. No. 913, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 2811, 2853; *cf. Dunlop v. State of New Jersey*, 522 F.2d 504, 514 n.20 (3d Cir. 1975), *vacated and remanded for consideration of National League of Cities sub nom. New Jersey v. Usery*, 427 U.S. 909, 96 S.Ct. 3196, 49 L.Ed.2d 1202 (1976). Thus, the Authority in effect would have us deal with the disputed question of the extent to which Congress can force a state, against its will, to be sued in a federal court by one of its citizens (or by a citizen of another state). *See generally* Tribe, *Intergovernmental Immunities in Litigation, Taxation and Regulation: Separation of Powers Issues in Controversies About Federalism*, 89 Harv.L.Rev. 682 (1976); Field, *The Eleventh Amendment and Other Sovereign Immunity Doctrines: Congressional Impositions of Suit Upon the States*, 126 U.Pa.L. Rev. 1203 (1978). *But see* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 231–32 (2d ed. Supp. 1981); *Employees v. Department of Public Health and Welfare of Missouri*, 411 U.S. at 292–93 n.8, 93 S.Ct. at 1621–22 n.8 (Justice Marshall, concurring in result).

We do not decide this question, however, and turn instead to the *National League of Cities* issue for several reasons. First, although the Authority does not address the matter, its authorizing statute specifically states that the Authority can be sued "in *all* courts of justice." 9 L.P.R.A. § 2004(*g*). (Emphasis supplied.) Since Puerto Rico has a unified court system with only one court of general jurisdiction, *see* Trias Monge, *El sistema judicial de Puerto Rico* 132 *et seq.* (1978); N. M. de Munoz Amato, *Problemas administrativos en el poder judicial de Puerto Rico* 40–41 (1964); Clark & Rogers, *The New Judiciary Act of Puerto Rico: A Definitive Court Reorganization*, 61 Yale L.J. 1147 (1952), this language sounds as if the Commonwealth has itself waived its sovereign immunity through "consent." *Cf. Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Association*, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981); *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (waiver is to be found only where stated "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction"). Be that as it may, to decide the Eleventh Amendment issue is likely to require a decision upon the basic *National League of Cities* question in any event. This is so because the Eleventh Amendment issue here is likely to turn upon the probability that, at a minimum, Congress lacks the power to override state sovereign immunity where it lacks the substantive power to impose federal standards upon the state. Tribe, *American Constitutional Law* 141 (1978). To decide the Eleventh Amendment question then would not save judicial resources. And, since the parties have not briefed these issues in any depth, it is simpler and more efficient to proceed directly to the *National League of Cities* question, which, in any event, leads to dismissal of this suit.

The main issue in this case is whether the Authority's activities constitute "traditional governmental functions." In *National League of Cities* the Supreme Court held that Congress lacked the power under the Commerce Clause of the Federal Constitution, Art. I, § 8, cl. 3—read in light of the Tenth Amendment (which reserves undelegated powers "to the States respectively or to the people")—to apply the FLSA to certain "public agencies." Recently, in *United Transportation Union v. Long Island R.R.*, —— U.S. ——, ——, 102 S.Ct. 1349, 1353, 71 L.Ed.2d 547 (1982), a unanimous Supreme Court described its holding in *National League of Cities* as follows:

[W]e held that Congress could not impose the requirements of the Fair Labor Standards Act on state and local governments. . . . Prior to 1974, the Act excluded most governmental employers. However, in that year Congress amended the law to extend its provisions in somewhat modified form to "public agencies," including state governments and their political subdivisions. We held that the 1974 amendments were invalid "insofar

as [they] operate to directly displace the States' freedom to structure integral operations in areas of *traditional governmental functions....*" 426 U.S. at 852, 96 S.Ct. at 2474. (Emphasis supplied.) In *National League of Cities* itself, the Court explained the notion of "traditional governmental functions," when it wrote of its concern about the impact of the FLSA on "the States' abilities to structure employer-employee relationships in such areas as fire prevention, police protection, sanitation, public health, and parks and recreation." 426 U.S. at 851, 96 S.Ct. at 2474. The Court noted that "[t]hese activities are typical of those performed by state and local governments in discharging their dual functions of administering the public law and furnishing public services." *Id.* And, it added that "[t]hese examples are obviously not an exhaustive catalogue of the numerous line and support activities which are well within the area of traditional operations of state and local governments." 426 U.S. at 851 & n.16, 96 S.Ct. at 2474 & n.16.

We are also helped by considering cases in lower courts. Instances in which a function has been considered "integral" or "traditional" include, *e.g.*, public schools and hospitals, *Williams v. Eastside Mental Health Center, Inc.*, 669 F.2d 671, 677–78 (11th Cir. 1982); solid waste disposal, *Hybud Equipment Corp. v. City of Akron, Ohio*, 654 F.2d 1187, 1196 (6th Cir. 1981), *vacated and remanded on other grounds*, —— U.S. ——, 102 S.Ct. 1416, 71 L.Ed.2d 640 (1982); operation of a municipal airport, *Amersbach v. City of Cleveland*, 598 F.2d 1033 (6th Cir. 1979); health care of the aged and sick, *NLRB v. Highview, Inc.*, 590 F.2d 174, 178, *vacated in part on other grounds*, 595 F.2d 339 (5th Cir. 1979); state licensing of automobile drivers, *United States v. Best*, 573 F.2d 1095, 1103 (9th Cir. 1978); the state legislature's adoption of rules for internal procedures, *Davids v. Akers*, 549 F.2d 120 (9th Cir. 1977), and the operation of a municipal transit system, *Alewine v. City Council of Augusta*, 505 F.Supp. 880 (S.D.Ga.1981). Contrasting instances where courts have found (for various purposes) that certain governmental activities are *not* "integral" or "traditional," include the operation of a railroad, *United Transportation Union v. Long Island R. R.*, —— U.S. at —— – ——, 102 S.Ct. at 1353–55, 71 L.Ed.2d 547; *United States v. California*, 297 U.S. 175, 56 S.Ct. 421, 80 L.Ed. 567 (1936); bottling mineral water, *New York v. United States*, 326 U.S. 572, 66 S.Ct. 310, 90 L.Ed. 326 (1946); selling liquor, *Ohio v. Helvering*, 292 U.S. 360, 54 S.Ct. 725, 78 L.Ed. 1307 (1934); the power to allow private citizens to engage in strip mining, *Nance v. Environmental Protection Agency*, 645 F.2d 701, 716 (9th Cir.), *cert. denied*, —— U.S. ——, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981); regulation of air carriers, *Hughes Air Corp. v. Public Utilities Commission of the State of California*, 644 F.2d 1334 (9th Cir. 1981); regulation and management of game, *United States v. Helsley*, 615 F.2d 784 (9th Cir. 1979); setting of safety standards for automobiles, *Vehicle Equipment Safety Commission v. National Highway Traffic Commission*, 611 F.2d 53 (4th Cir. 1979); operation of an oil and gas company, *Public Service Company of North Carolina, Inc. v. Federal Energy Regulatory Commission*, 587 F.2d 716 (5th Cir.), *cert. denied sub nom. Louisiana v. Federal Energy Regulatory Commission*, 444 U.S. 879, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); state regulation of employee benefit plans, *Hewlett-Packard Co. v. Barnes,* 425 F.Supp. 1294 (N.D.Cal.1977), *aff'd,* 571 F.2d 502 (9th Cir.), *cert. denied,* 439 U.S. 831, 99 S.Ct. 108, 58 L.Ed.2d 125 (1978); *Standard Oil Co. v. Agsalud,* 442 F.Supp. 695, 710–11 (N.D. Cal.1977), *aff'd,* 633 F.2d 760 (9th Cir. 1980), *aff'd,* 454 U.S. 801, 102 S.Ct. 79, 70 L.Ed.2d 75 (1981); air pollution plans related to highway and bridge regulation, *Friends of the Earth v. Carey,* 552 F.2d 25 (2d Cir. 1977), and state operation of a telephone company, *Puerto Rico Telephone Co. v. FCC,* 553 F. 2d 694 (1st Cir. 1977).

The Sixth Circuit has suggested that courts, in deciding this question, have considered such factors as whether the activity benefits the community as a whole, whether it was made available to the public at little or no expense, whether it was undertaken

for the purpose of public service rather than profit, whether the government was its principal provider, and whether the government was particularly well suited to provide the service or activity because of a community-wide need for it. *Amersbach v. City of Cleveland*, 598 F.2d at 1037.

The parties here are apparently willing for us to apply these tests and analogies to the Puerto Rico Highway Authority, even though the record is vague about what the Authority actually does. Despite misgivings growing out of this vagueness, we do so in the interests of judicial economy and because we see no likelihood of a misdescription important enough to change the result.

■ We have no doubt that the Authority is an integral part of the Commonwealth government. *See Hodel v. Virginia Surface Mining & Reclamation Association, Inc.*, 452 U.S. 264, 286–93, 101 S.Ct. 2352, 2365–69, 69 L.Ed.2d 1 (1981); *Hodel v. Indiana*, 452 U.S. 314, 330, 101 S.Ct. 2376, 2386, 69 L.Ed.2d 40 (1981). The Authority is attached to the Commonwealth's Department of Transportation and Public Works, whose Secretary now operates it. 3 L.P.R.A.App. III § V. Originally, the law creating the Highway Authority, Law No. 74 of June 23, 1965, established that "[t]he powers of the Authority [would] be exercised by a Board of Directors which would be composed by several Commonwealth officials." But Reorganization Plan No. 6 of 1971 provided that:

> The Highway Authority is hereby attached to the Department of Transportation and Public Works. The powers and duties of the Authority shall be discharged by the Secretary of Transportation and Public Works. The Board of Directors of the Highway Authority is hereby abolished, without it being understood that the duties and powers are in any other manner restricted.

(Emphasis supplied.) As a practical matter, the "Highway Authority" seems to consist of a set of powers and obligations entrusted to the Commonwealth Secretary of Transportation and Public Works within the department of government that he runs. *See*

3 L.P.R.A. §§ 411 *et seq. Compare Williams v. Eastside Mental Health Center*, 669 F.2d at 679; *NLRB v. Highview, Inc.*, 590 F.2d at 176–77. The Authority issues no stock. Although it can float bonds, spend money, charge tolls and fees, own and dispose of property, sue and be sued, the Commonwealth's legislature did not intend it to be considered in any sense a private body. To the contrary, it specifically wrote that the Authority;

> shall exercise public and essential governmental functions. The execution by the Authority of the powers and faculties granted by this chapter shall in no case have the effect of investing the Authority with the character of a private enterprise.

9 L.P.R.A. § 2002; *see* 9 L.P.R.A. § 2017(a). The Authority's bonds, like other government obligations, are tax exempt, 9 L.P.R.A. § 2017; its employees do not enjoy the right of quasi-public corporations' employees to organize and to bargain collectively under 29 L.P.R.A. § 63(11).

As to the Authority's activities, we infer from the statute and the briefs before us that the Authority arranges for the building of roads, sometimes builds roads itself, operates toll roads, keeps its roads in repair, and (we take appellants' word for it) operates some parking lots and plans to build a mass transit system. *See* 9 L.P.R.A. § 2004.

This list of activities is sufficient to indicate that the Authority is responsible for "traditional" or "integral" governmental activities. Certainly governments have built and maintained roads from time immemorial. Let any who doubt the deep-rooted and traditional connections between roads, commerce, communications and society read, for example, V.W. von Hagen, *The Roads That Led to Rome* (1967) or M. Bloch, "Feudal Society" in N. Cantor & M. Werthman, *Medieval Society* 8–11 (1967). Road building is designed to benefit the community as a whole. Road building is undertaken here, as elsewhere, for the purpose of public service, not profit. The government is the principal provider of the service.

And, some free market economists to the contrary notwithstanding, the public considers the government best suited to arrange for the building and maintaining of roads and highways because of their community-wide impact. We can find no meaningful distinction between the Authority's activities, and those, for example, of a municipal airport, *Amersbach v. City of Cleveland, supra,* or the parks, recreation, and public health activities mentioned in *National League of Cities* itself.

The fact that the Authority collects tolls—*see* 9 L.P.R.A. § 2004(j)—concededly means that the Authority's services may not be provided at "little or no direct expense" to the public. But, the same is true of many health services, recreational services, airport services, and city transit. Indeed, since we can think of few private corporations that operate toll roads, this factor makes the Authority's functions look all the more traditional. Nor does the fact that the Authority operates parking lots make a difference. Any such operation would appear to be incidental to the Authority's main tasks; but, even if it were not, the appellants are not parking lot attendants; rather, their work is related to the Authority's road building and maintenance activities. The fact that other laborers in the private sector might perform similar work is equally true of most hospital employees as well as, for example, the typists in police stations, or caretakers at fire stations. Thus, we do not believe appellants' cited distinctions are sufficient to take this case outside of the "traditional" or "integral" category set out in *National League of Cities.*

Since the Authority's activities fall within *National League of Cities'* category of "traditional" or "integral" governmental functions, the FLSA's minimum wage law does not apply to these appellants. Though the method of calculating minimum wages for Puerto Rico differs from that of the fifty states, 29 U.S.C. §§ 205–06, the FLSA's statutory mechanism for applying the minimum wage both to Puerto Rico and to the states is contained in the same definitional section, which defines an "employer" as "in-

clud[ing] . . . a public agency." 29 U.S.C. § 203. In *National League of Cities*, the Court held that Congress could not constitutionally apply the words "public agency" to workers such as appellants where the employing "public agency" is that of a state. There is no language, history, or purpose related to this statute suggesting that Congress intended Puerto Rico to be treated any differently from a state for purposes of determining the application of these words. *See* H.R.Rep.No. 913, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Ad. News 2811, 2821, 2834–35. From this we conclude that Congress, had it foreseen the *un*constitutionality of these words (withdrawing their application to the states) would have intended withdrawal of their applicability *pro tanto* from Puerto Rico as well.

■ We are buttressed in this conclusion by the fact that *National League of Cities* reflects an intent to protect the states from federal regulation that might "endanger [their] separate and independent existence." *United Transportation Union v. Long Island R.R.,* ── U.S. at ──, 102 S.Ct. at 1355, 71 L.Ed.2d 547. Given the language and the structure of the FLSA, it is unreasonable to conclude that Congress wished to endanger the related "separate and independent existence" it embodied in its 1952 Compact with Puerto Rico. *See Examining Board of Engineers, Architects and Surveyors v. Flores de Otero,* 426 U.S. 572, 594, 96 S.Ct. 2264, 2277, 49 L.Ed.2d 65 (1976) ("the purpose of Congress in the 1950 and 1952 legislation was to accord to Puerto Rico the degree of autonomy and independence normally associated with a State"); *Calero-Toledo v. Pierson Yacht Leasing Co.,* 416 U.S. 663, 671–73, 94 S.Ct. 2080, 2085–86, 40 L.Ed.2d 452 (1974); *Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank,* 649 F.2d 36, 39–42 (1st Cir. 1981). Thus, given *National League of Cities* we conclude, as a matter of statutory construction, that the words "public agency" no longer apply in Puerto Rico to the same extent that they no longer apply in the states. *See Calero-Toledo v. Pierson Yacht*

*Leasing Co., supra; Cordova & Simonpietri Insurance Agency, Inc. v. Chase Manhattan Bank, supra; United States v. Figueroa Rios,* 140 F.Supp. 376 (D.P.R.1956); *Trigo Bros. Packing Corp. v. Davis,* 159 F.Supp. 841 (D.P.R.1958), *vacated on other grounds,* 266 F.2d 174 (1st Cir. 1959). Consequently, we need not consider the constitutional question of whether the Tenth Amendment applies to Puerto Rico as it would apply to a state. *Cf. Ezratty v. Commonwealth of Puerto Rico,* 648 F.2d at 776 n.7.

For these reasons, the judgment of the district court is

*Affirmed.*