**PEOPLE OF TOGIAK et al., Plaintiffs,**

**v.**

**UNITED STATES of America et al., Defendants.**

Civ. A. No. 77–0264.

United States District Court, District of Columbia, C. D.

April 3, 1979.

Michael B. Trister, Washington, D. C., David B. Snyder, Dillingham, Alaska, for plaintiffs.

William B. Morrison, Bruce C. Rashkow, U.S. Dept. of Justice, Washington, D. C., for defendants.

## OPINION AND ORDER

Harold H. GREENE, District Judge.

The Marine Mammal Protection Act (MMPA)[1] enacted by the Congress in 1972, allows Alaskan Natives[2] to hunt walrus under specified conditions. However, the State of Alaska, to which the Secretary of the Interior has purported to transfer the power to regulate such hunting, effectively prohibits Native taking of these marine mammals. This is an action by such Natives for an order to declare invalid the Interior Department regulations. Plaintiffs argue that federal law has preempted the field to the exclusion of state authority, and that for this reason the Interior Department regulations and those promulgated by the State of Alaska are void and of no effect. Presently pending before the Court is defendants' motion to dismiss which asserts that the Interior Department's transfer of authority to the State is consistent with federal law.

I ·

Section 1371 of title 16, U.S.Code, imposes a moratorium on the taking of marine mammals, including the Pacific walrus (Odobenus rosonarus),[3] but subsection (b) of the same section establishes an exemption in favor of Alaskan Natives. That subsection provides in pertinent part:

The provisions of this Act shall not apply with respect to the taking of any marine mammal by any Indian, Aleut, or Eskimo who dwells on the coast of the North Pacific Ocean or the Arctic Ocean if such taking—

(1) is for subsistence purposes by Alaskan natives who reside in Alaska, or

(2) is done for purposes of creating and selling authentic native articles of handicrafts and clothing . . .; and

(3) in each case, is not accomplished in a wasteful manner.

Notwithstanding the preceding provisions of this subsection, when, under this chapter, the Secretary determines any species or stock of marine mammals subject to taking by Indians, Aleuts, or Eskimos to be depleted, he may prescribe regulations upon the taking of such ma-

---

1. P.L. 92–552, 86 Stat. 1027. The Act is codified in 16 U.S.C. § 1361 et seq.

2. Alaskan Natives are Eskimos, Indians, and Aleuts.

3. The Act also deals with whales, dolphins, porpoises, polar bears, seals, and other species. However, only the hunting of the Pacific walrus is involved in this action. 50 C.F.R. 18.94.

rine mammals by any Indian, Aleut, or Eskimo . . . with reference to species or stock, geographical description of the area included, the season for taking, or any other factors . . . consistent with the purposes of this chapter. . .

Thus, under the exemption provision, Alaskan Natives may continue to hunt and take walrus without regard to the moratorium, provided that (1) the species is not depleted, (2) the takings are not wasteful, and (3) the takings are conducted only for subsistence purposes or for the purpose of creating and selling authentic native articles of handicraft and clothing.

In April 1976, the Secretary of the Interior adopted regulations which provide in pertinent part that the "exemption for hunting and killing of Pacific walrus by Alaskan natives under section 101(b) of the Act [Section 1371(b)] is rescinded and superseded . . . [and] will be accomplished . . . in accordance with title 16 of the Alaska Statutes and the approved regulations promulgated thereunder." 50 C.F.R. 18.94(a), 41 Fed.Reg. 14373 (April 5, 1976). The State, in turn, has adopted regulations which far more severely than the MMPA restrict the taking of walrus by Alaskan Natives, and which, in the areas in which plaintiffs reside, totally prohibit such taking. 5 Alaska Administrative Code § 81.-340(4) (Reg. 59, Oct. 1976); see also, 42 Fed.Reg. 25924 (May 20, 1977).

The basic question on defendant's motion to dismiss is whether the federal statute preempts[4] State jurisdiction with respect to the subject matter at issue. If it does, both the *regulations purporting to transfer the* control of walrus taking to the State of Alaska and the State's prohibitions on subsistence hunting by Alaskan Natives are of no effect, for such regulations then improperly contravene the provisions of section 1371(b) which explicitly and more broadly

than the Alaska laws allow Native hunting. If the substantive provisions of the federal law do not preempt State jurisdiction, the Secretary's regulations are not invalid, because on that assumption these regulations only restore to the State that which the State would be entitled to control in any event.

## II

16 U.S.C. § 1379 (section 109 of the Marine Mammal Protection Act) is a broad and detailed preemption provision entitled "Federal cooperation with States—State regulation of taking of marine mammals." Subsection (a)(1) of that section provides that

Except as otherwise provided in this section, no State may adopt any law or regulation relating to the taking of marine mammals within its jurisdiction or attempt to enforce any State law or regulation relating to such taking.

There is nothing in any part of section 1379 (or anywhere else in the Act) which could be construed as "otherwise providing" a specific authorization to the State for the enactment of a law or regulation relating to the taking of marine mammals by Native Alaskans. To the contrary, as discussed *supra,* section 1371(b) of the Act explicitly authorizes Native takings within the limits and for the purposes set forth in that section.

Defendants' argument that these statutory provisions do not mean what they appear plainly to say is based upon the proposition that the introductory clause of section 1371(b), which stipulates that the provisions of "this [Act]" shall not apply to Native takings of marine mammals, should be read to exempt the Native takings section not merely from the moratorium, but from the entire Act, including the Act's section 1379

---

**4.** When federal law preempts, it occupies the field to the exclusion of State and local regulations, pursuant to the Supremacy Clause of the Constitution, Art. VI, cl. 2. Where a subject matter is in the federal domain, Congress may take unto itself all regulatory authority over it, share the task with the States, or adopt as federal policy the State scheme of regulation. "The question in each case is what the purpose of Congress was." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 229–30, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

preemption provision. If, under that construction, the preemption provisions do not apply to the Native takings clause, then it follows, so the government reasons, that there is no federal preemption with respect to the subject matter covered by that section, and defendants are free to transfer to the State, or leave to the State (see p. 429 *infra*) the authority to regulate all Native takings. In the opinion of this Court, that interpretation is both too ingenious and too facile.

Considering only the statutory language most directly involved, the most logical and sensible construction of the provision in section 1371(b) that "the provisions of this [Act] shall not apply" to certain Native takings is that Congress meant that the substantive provisions of the Act—that is, the moratorium—shall not apply to these takings. The alternative construction proposed by the government, while it finds some literal support in the statute, is far more strained, and it is at odds, moreover, with the statutory scheme as a whole.

As indicated, section 1379 is not only the preemption provision of the Act, but it deals with the entire subject matter of State regulation of the taking of marine mammals and with federal-State cooperation in this area. If the Congress had intended not to preempt the field with respect to Native takings, section 1379 would have been a far more logical place for ex-

pressing that purpose[5] than the introductory clause of section 1371(b).

In order to sustain defendants' position, the Court would have to assume that although Congress plainly prescribed the circumstances under which Natives may hunt walrus notwithstanding a general moratorium on such hunting; and although it stated in equally plain as well as in detailed and comprehensive terms the circumstances under which the State may regulate marine mammals, without mentioning as one such circumstance State regulation of Native takings of such mammals; it still meant to achieve the result of permitting just such regulation by the obscure and convoluted method defendants ascribe to it. The Court is not prepared to engage in such an assumption without strong extrinsic evidence that this was indeed the congressional purpose. But such evidence is not only lacking; all available indicia point in the opposite direction.[6]

### III

Substantively, two major competing policy considerations are here involved—the need for protecting marine mammals from depletion, on the one hand,[7] and the responsibility of the federal government to protect the way of life of the Alaskan Natives (see pp. 428–429, *infra*), including their tradition of hunting marine mammals for their

---

**5.** See 2A Sutherland, Statutory Construction, sec. 47.23.

**6.** Except for the legislative history strictly speaking, which is equivocal and not helpful to either side. Plaintiffs and defendants rely on various portions of that history in support of their respective positions. Defendants cite the Conference Report (Conf.Rept. No. 92–1488, 92d Cong.2d Sess. 4188, U.S.Code Cong. & Admin.News 1972, p. 4144) and a Senate Report (S.Rept. No. 92–863, 92d Cong.2d Sess. 14, U.S. Code Cong. & Admin.News 1972, p. 4144) which are at best ambiguous; as well as statements made by Senator Stevens of Alaska after the enactment of the statute. Plaintiffs rely on a statement on the House floor by Representative Begich of Alaska (118 Cong.Rec. 7703–4 (1972)), another by Representative Dingell (117 Cong.Rec. 44954 (Dec. 6, 1971)), and a state-

ment by Senator Stevens during the Senate debates (118 Cong.Rec. 25258 (1972)). Without discussing these materials in detail here, it is fair to conclude that—as is frequently the case—none of them, or the additional fragments cited by the parties, add up to a consistent or persuasive expression of congressional intent.

**7.** The MMPA states that "marine mammals have proven themselves to be resources of great international significance, esthetic and recreational as well as economic, and it is the sense of the Congress that they should be protected and encouraged to develop . . . [and they] should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part . . ." 16 U.S.C. § 1361.

subsistence, on the other.[8] What emerges vividly from an examination of the total statutory scheme is that the Congress carefully considered these competing considerations and deliberately struck a balance which permits continued hunting by the Alaskan Natives as long as this is done in a non-wasteful manner, is restricted to the taking of non-depleted species, and is accomplished for specified, limited purposes. It is also clear that, to the extent that it was necessary to do so, Congress intended to preempt the field so as to eliminate inconsistent State regulation while permitting regulation which complements the statute's design.

The government suggests that a construction which would "leave these mammals at the mercy of unrestricted native hunting" is inconsistent with this balanced approach (Reply Memorandum, p. 3). Section 1371(b) hardly grants to the Alaskan Natives an "unrestricted" hunting license, for these Natives are restricted both as to amount (the takings must be non-wasteful and they may not affect a depleted species) and as to purpose (hunting is prohibited except for subsistence and for native handicrafts). Rather, it is defendants' proposed interpretation which would upset the balance carefully crafted by the Congress, for that interpretation would give an absolute priority to the protection of marine mammals over the rights of Alaskan Natives who have depended from time immemorial upon the walrus as their source of fresh meat.

The balanced approach in dealing with Alaskan Natives and marine mammals is not a new one. Other laws dealing with similar subject matter have, without exception, exempted Eskimos and other Natives from bans on hunting, to the extent necessary to satisfy their traditional needs. The Endangered Species Act, 16 U.S.C. § 1531 et seq., provides in section 1539(e)(1) that the Act "shall not apply with respect to the taking of any endangered species or threatened species . . . by any Indian, Aleut, or Eskimo who is an Alaskan Native who resides in Alaska . . . if such taking is primarily for subsistence purposes . . . .." The Fur Seal Act specifically permits Indians, Aleuts, and Eskimos to take and dispose of fur seals under certain circumstances (16 U.S.C. § 1152(a)), and it does so, moreover, with the imprimatur of an international agreement entered into by the United States with the Soviet Union, Japan, and Canada. 4 Whiteman, Digest of International Law, 1042–48. And the Walrus Protection Act of 1941, 48 U.S.C. § 248 et seq., again contained an exemption for Alaskan Natives who were permitted to hunt for food and clothing for themselves, and also for such purposes as the sale of ivory and walrus hides.[9] Defendants have not pointed to any statute dealing with marine mammals which does not or did not exempt Alaskan Native taking from more general prohibitions on hunting wildlife, and that lack is at least some evidence of a congressional intent not to enact such an exemption here by the obscure method defendants ascribe to the national legislature.[10]

8. The complaint alleges that the "Native people of Togiak, Twin Hills, and Goodnews Bay on the southwest coast of Alaska have been hunting and using walrus for thousands of years." Complaint, par. 7. Attached to plaintiffs' motion for class certification are a resolution adopted by the City Council of the City of Togiak stating that the people of Togiak and the surrounding villages have traditionally depended upon the walrus for their subsistence, as distinguished from hunting for sport; a petition signed by a number of Alaskan Natives who claim to be dependent upon the walrus for subsistence; and various individual affidavits indicating the need of the Natives for walrus as a source of fresh meat.

9. The parties are in disagreement as to whether this statute was repealed by implication by the Alaska Statehood Act, 48 U.S.C. § 6. In view of the ultimate conclusion of the Court with respect to the meaning of the MMPA, it is not necessary to resolve that disagreement here. But see *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968). In any event the substantive significance of the Walrus Protection Act, as expressive of a general policy, is not affected by whatever might the appropriate resolution of the repeal issue.

10. The MMPA itself is likewise not monolithic, for Alaskan Natives who rely on the hunting of walrus for their subsistence are not the only

In short, the overall purpose evidently sought to be achieved by the Congress in this and related laws is wholly at odds with a construction which would leave the Alaskan Natives subject to a total prohibition on walrus hunting, whether that prohibition be achieved by the federal authorities, the State of Alaska, or both in combination.

## IV

■ In an analysis of the preemption issue, it is not without significance that the subject matter being regulated is one which has traditionally been a federal responsibility. Where dominant federal interests or comprehensive federal regulation are involved, preemption is more readily presumed than if the area is one where such interests are peripheral or such regulation is unusual or fragmented. See *Rice v. Santa Fe Elevator Co., supra; Warren Trading Post Co. v. Arizona State Tax Commission,* 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965). In the instant statute, we are dealing with a comprehensive scheme in an area where federal responsibility and involvement are and always have been exceptionally strong and direct.

From the very adoption of the Constitution, the federal government has enacted legislation concerning Indians pursuant to its power in Art. I, sec. 8, cl. 3, to regulate commerce with the Indian tribes. *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). In addition to that express constitutional power, federal authorities have long been held to have a trust responsibility toward Indians (*Cherokee Nation v. Georgia,* 5 Pet. (30 U.S.) 1, 8 L.Ed. 25 (1831); cf. *Organized Village of Kake v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); see also, 25 U.S.C. §§ 2, 13), and to Alaskan Natives. *Alaska Pacific Fisher-*

*ies v. United States,* 249 U.S. 53, 39 S.Ct. 208, 63 L.Ed. 474 (1918); *Edwardsen v. Morton,* 369 F.Supp. 1359 (D.D.C.1973).

■ These various responsibilities impose fiduciary duties upon the United States (*Morton v. Mancari, supra,* 417 U.S. at 553, 94 S.Ct. 2474), including the duties so to regulate as to protect the subsistence resources of Indian communities (*Pyramid Lake Paiute Tribe of Indians v. Morton,* 354 F.Supp. 252 (D.D.C.1953)) and to preserve such communities as distinct cultural entities against interference by the States. *Worcester v. Georgia,* 6 Pet. (31 U.S.) 515, 8 L.Ed. 483 (1832); *McClanahan v. Arizona State Tax Commission,* 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). It is presumably to implement these various powers and duties that Congress adopted the Native exemption from the general moratorium established by the MMPA, and an abandonment of those responsibilities should not be lightly presumed.

Even in the other area affected by the statute—the regulation of wildlife—there is significant federal jurisdiction and responsibility (*Kleppe v. New Mexico,* 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976)), although that responsibility is shared to a more significant degree with the States. *McCready v. Virginia,* 94 U.S. 391, 24 L.Ed. 248 (1876); *Douglas v. Seacoast Products Inc.,* 431 U.S. 265, 97 S.Ct. 1740, 52 L.Ed.2d 304 (1977).

■ In view of this variety of federal interests and the comprehensive scheme of regulation established by the Congress,[11] any ambiguity on the question of the survival of State regulation inconsistent with the substantive federal plan is properly resolved against the State's assertion of au-

---

group exempt from the moratorium. There is a two-year exemption for the benefit of tuna fishermen (16 U.S.C. § 1371(a)(2)); in prescribing regulations, the Secretary is required to take into account, among other factors, economic feasibilities of implementation (16 U.S.C. § 1373(b)(5)); and marine mammals may be taken for scientific study and display (16 U.S.C. § 1371(a)(1)). These exemptions, too, suggest that the construction proposed by plaintiffs is

neither as unusual nor, in the apparent view of the Congress, as disastrous as defendants portray it.

11. The MMPA was designed to substitute for diverse State marine mammal hunting laws a comprehensive federal system. See House Rept. No. 92–707 (Dec. 4, 1971), U.S.Code Cong. & Admin.News 1972, p. 4149.

thority and thus against the scheme established by the Secretary's 1976 regulations.

## V

The conclusion emerging from these considerations—that the Native exemption section preempts the field—is supported also by the provisions of the MMPA which grant to the Secretary of the Interior the authority to promulgate regulations and his exercise of that authority.

Section 1379(a)(2) provides that

Any State may adopt and enforce any laws or regulations relating to the protection and taking, within its jurisdiction, of any species or population stock of marine mammals if the Secretary determines, after review thereof, that such laws and regulations will be consistent with [the MMPA and regulations issued pursuant thereto].

Defendants have taken a number of different positions with respect to the application of this provision to the issues governing this case.

On one phase of this litigation they argue that the recent Alaska regulations largely prohibiting Native takings of walrus are consistent with the MMPA because the federal statute, notwithstanding the explicit language of section 1371(b), never established a federally preeminent Native exemption but meant to leave that subject to the States. That raises an initial question as to why the Congress would want, on the one hand, explicitly to allow State regula-

tion which is consistent with the MMPA,[12] while on the other also implicitly to sanction such regulation even when it is inconsistent with the substantive provisions of that law. Then there is the further question why, if defendants' view of the statute is sound, they promulgated regulations at all. Defendants contend in this action (Reply Memorandum, p. 11) that their waiver of the Native exemption and their transfer of control over the walrus takings to the State of Alaska "are of no effect and can result in no injury to plaintiffs" because "the MMPA did not assume jurisdiction over such takings but left such jurisdiction where it was prior to the Act—in the State." If that be true, and if the Secretary's regulations are meaningless, it is difficult to understand why he felt it necessary or appropriate to issue them. A far more plausible explanation for the issuance of the regulations is that the Secretary concluded that without them the State had no conceivable authority to regulate the subject matter.[13] Yet such an assumption undermines the current anchor of defendants' argument in this Court: that the State had jurisdiction all along, with or without Interior Department sanction.

■ The Department of the Interior itself must have had some doubts concerning the logic of its arguments here, for in 1974 it took a position directly contrary to that which it is taking now. At that time, it prohibited Alaskan Native takings of walrus only when they exceeded the substantive bounds of section 1371(b).[14] Defend-

---

12. Section 1379(c) provides that when cooperative arrangements are entered into with State officials, they must be appropriate "to insure that the purposes and policies of [the Act are] carried out."

13. Actually, the State of Alaska appears to be less sanguine about its authority in the absence of federal regulations than the U.S. Secretary of the Interior. See *e. g., In re Waiver of Moratorium on Walrus under Regulations for a Cooperative State/Federal Program,* Docket No. 75-1, vol. II, p. 306.

14. Regulations implementing the MMPA were adopted in 1974 and are found at 50 C.F.R. § 18.1–18.33 (Subparts A–E), 39 Fed.Reg. 7262 (Feb. 25, 1974). Subpart A, detailing the situa-

tions in which State laws may apply notwithstanding federal preemption, does not mention subsistence hunting by Natives as one of those exceptions to exclusive federal regulation, and Subpart C provides that such Natives may take marine mammals without a permit if the taking is for the purposes enumerated in section 1371(b) and is accomplished in a non-wasteful manner. It was only later, in 1976, that Subpart H was adopted, rescinding the Native exception found in section 1371(b). It may also be noted·in this connection that Subpart E, which is entitled "Depleted Species of Stock," has never been implemented by any regulations, which is some indication that defendants do not consider walrus to be a depleted species.

ants are of course correct in their assertion (Reply Memorandum, p. 10) that an administering agency is not barred from correcting an erroneous construction of a statute. Nevertheless, their prior administrative interpretation is yet further evidence that the relatively tortured interpretation they advance presently is incorrect.

For these reasons, the Court concludes that the Marine Mammal Protection Act permits Alaskan Natives to hunt non-depleted walrus in a non-wasteful manner for the purposes specified in 16 U.S.C. § 1371(b), and it is accordingly, this 2nd day of April, 1979,

ORDERED That the motion to dismiss be and it is hereby denied.

After this case was heard in this Court, new regulations were adopted by the Departments of the Interior and Commerce (44 F.R. 2540 et seq.). These regulations are consistent with the position taken by the Department of the Interior under challenge in this case, but they do not otherwise substantively add to or detract from the weight of the parties' contentions.