**UFO CHUTING OF HAWAII, INC., a Hawaii corporation and K.M.B.S., Inc., a Hawaii Corporation, d.b.a. Kaanapali Tours, Plaintiffs,**

v.

**Peter T. YOUNG, in his capacity as Chair of the Board of Land and Natural Resources, State of Hawaii; Stephen Thompson, in his capacity as Acting Administrator, Division of Boating and Ocean Recreation, Department of Land and Natural Resources, State of Hawaii, Defendants.**

**No. CIV. 03–00651 SOM/BMK.**

United States District Court,
D. Hawai'i.

July 9, 2004.

Dennis Niles, Paul, Johnson, Park & Niles, Wailuku, HI, for Plaintiffs.

William J. Wynhoff, Honolulu, HI, for Defendants.

*ORDER GRANTING PLAINTIFFS' MO-TION FOR SUMMARY JUDG-MENT AND DENYING DEFEN-DANTS' MOTION FOR SUMMARY JUDGMENT*

MOLLWAY, District Judge.

## I.  *INTRODUCTION.*

Plaintiffs UFO Chuting of Hawaii, Inc., and K.M.B.S., Inc. (collectively, "UFO"), are parasail operators who challenge the validity of a Hawaii law that bans parasailing in the navigable waters surrounding the west and south shores of Maui from December 15 to May 15. UFO argues that the state law is preempted by federal

law and therefore violates the Supremacy Clause. UFO and the State of Hawaii have filed cross-motions for summary judgment. The court agrees with UFO that the State's seasonal parasailing ban is expressly preempted by the Marine Mammal Protection Act ("MMPA") and actually conflicts with federal law.[1]

## II.  *BACKGROUND FACTS.*

UFO operates a parasailing business along the navigable waters between Lahaina and Kaanapali on the coast of Maui. The navigable waters between Lahaina and Kaanapali are within the Hawaiian Islands Humpback Whale National Marine Sanctuary. UFO's two vessels have been inspected and licensed by the Coast Guard to carry up to twelve passengers in coastwise trade. UFO also holds permits issued by the State Division of Boating and Ocean Recreation, Department of Land and Natural Resources ("DOBOR"), authorizing the use of its vessels for parasailing between Lahaina and Kaanapali from May 16 to December 14, 2003. From December 15, 2003, to May 15, 2004, the permits issued by DOBOR forbid parasailing and certain other forms of recreational activity, but allow the use of the vessels for other purposes. The DOBOR restriction was adopted pursuant to Haw.Rev.Stat. § 200–37(I), which states, "Between December 15 and May 15 of each year, no person shall engage in parasailing . . . or operate a motor vessel towing a person engaged in . . . parasailing on the west and south shore of Maui as provided in section 200–38."

UFO previously moved for a temporary restraining order, which the court denied.

---

1. As this ruling is dispositive of the entire case except the prayer for a permanent injunction, discussed later in this order, the court does not address other arguments or claims raised by UFO.

### III. STANDARD OF REVIEW.

Summary judgment shall be granted when the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c); *see also Addisu v. Fred Meyer, Inc.,* 198 F.3d 1130, 1134 (9th Cir.2000). One of the primary purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial. *See id.* at 323, 106 S.Ct. 2548. A moving party without the ultimate burden of persuasion at trial—usually, but not always, the defendant—has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.,* 210 F.3d 1099, 1102 (9th Cir.2000).

While all evidence and inferences must be construed in the light most favorable to the nonmoving party, the nonmoving party must produce at least some "significant probative evidence tending to support the complaint." *T.W. Elec. Service, Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). "Legal memorandum and oral argument are not evidence and they cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion where no dispute otherwise exists." *British Airways Bd. v. Boeing Co.,* 585 F.2d 946, 952 (9th Cir. 1978).

### IV. ANALYSIS.

UFO contends that federal law preempts the state parasailing regulation. Federal law may preempt state law in three ways:

(1) federal law may explicitly preempt state law in a given area;

(2) federal law may implicitly preempt state law by dominating regulation in a given area; or

(3) state law may actually conflict with federal law.

*Young v. Coloma–Agaran,* 340 F.3d 1053, 1055 (9th Cir.2003).

This court finds preemption in the first and third ways.

#### A. The MMPA Expressly Preempts the Parasailing Restriction.

■ The MMPA expressly preempts state laws relating to the taking of marine mammals and therefore preempts the Hawaii seasonal parasailing ban. *See* 16 U.S.C. § 1379(a). Section 1379(a) in the MMPA states:

No State may enforce, or attempt to enforce, any State law or regulation relating to the taking of any species (which term for purposes of this section includes any population stock) or marine mammal within the State unless the Secretary has transferred authority for the conservation and management of that species (hereinafter referred to in this section as "management authority") to the State under subsection (b)(1) of this section.

"Take" is defined broadly to mean "harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." 16 U.S.C. § 1362(13). "Harassment" is defined to include:

any act of pursuit, torment, or annoyance which—

(1) has the potential to injure a marine mammal or marine mammal stock in the wild; or

(2) has the potential to disturb a marine mammal or marine mammal stock in the wild by causing disruption of behavioral patterns, including, but not limited to, migration, breathing, nursing, breeding, feeding, or sheltering.

16 U.S.C. § 1362(18)(A).

UFO contends that the seasonal parasailing ban relates to the taking of marine mammals because it is legislation designed to prevent harassment by preventing injury to whales and by protecting their breeding territories. UFO Countermotion at 4–5. The State contends that the parasailing restriction does not relate to the harassment of whales and that § 1379(a) is therefore inapplicable. Reply at 3–4. The State further contends, "[P]arasailing in the whale sanctuary *cannot* be 'harassment.' If it was, then plaintiffs could not do it under federal law, and the state law would be superfluous." *Id.* at 4.

1. *The Parasailing Restriction Relates to the Taking of Marine Mammals.*

The Supreme Court has held that Congress expresses a "broad pre-emptive purpose" when using the words "relate to." "To relate to" ordinarily means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 382, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (citing Black's Law Dictionary 1158 (5th ed.1979)).

Given the broad definition of "relates to," the parasailing restriction relates to the taking of whales. A primary intent of, and justification for, the parasailing restriction is to prevent the harassment of whales. *See* State Exs. B–F.[2] That the State considered other justifications as well when it adopted the restriction does not mean that the restriction does not relate to the safety of whales.

The State argues that the Hawaii legislature was concerned with water safety, visual and aural pollution, and protection of animals not covered by the MMPA, and that the law does not relate to harassment of animals protected by the MMPA. Reply at 4. The legislature was indeed concerned about water safety. *See* State Ex. A. However, the law was specifically tailored to protect whales, not humans. Recreational boating does not necessarily pose a greater threat to humans in the winter than in the summer. In fact, safety could be a greater concern in the summer, when there are more boats and people in the water. The law, however, bans parasailing during the winter months when whales are migrating in Hawaiian waters. Concern for the whales was a primary, if not the, motivating factor behind the dates con-

**2.** In considering the parasailing restriction, the legislature received extensive testimony from interested parties, including scientists, community groups, business groups unaffiliated with the boating industry, and UFO itself. *See id.;* State Opp. to UFO's Motion for TRO Ex. D.

The legislature received testimony from Dr. Mark J. Ferrari and Dr. Deborah A. Glockner–Ferrari, who have researched humpback whales for more than sixteen years, mostly in Hawaiian waters. *See* State Ex. F. Ferrari and Glockner–Ferrari argued that their research demonstrates that "Any high speed activity such as parasailing ... produce[s] both a point disturbance at the surface of the water, as well as an acoustic disturbance (noise pollution) under water." *Id.* They argue that these recreational activities push whales from their preferred habitat and "pose a particular threat to the recovery of the Hawaiian humpback whale population." *Id.* The legislature also received testimony from the Sierra Club Legal Defense Fund, Inc., which outlined research done by numerous scientists concerned that boating may harm whales. *See* State Ex. C.

tained in the parasailing restriction, not merely an incidental consideration. The law therefore clearly relates to the taking of whales.

The court is unpersuaded by the State's argument that, if a law on parasailing relates to a taking, parasailing itself must necessarily be a taking in violation of federal law, and therefore must be totally banned. A matter can relate to a taking without necessarily being a taking. More concretely, federal law does not proscribe parasailing so long as a boat remains at least 100 yards from whales.

In 1979, the National Oceanic and Atmospheric Administration ("NOAA") adopted a regulation prohibiting approaching within 300 yards of a humpback whale in breeding grounds and 100 yards in other areas. 50 C.F.R. § 222.31; *see also* Appendix 1 attached to UFO's MSJ. In the 1994 amendments to the MMPA, Congress expressly repealed the 300–yard limitation in breeding grounds and established a perimeter of 100 yards in all waters. *See* Pub.L. No. 103–238, 1994 Stat. 1636; *see also* 15 C.F.R. § 922.184(a)(1); Appendix 5 attached to UFO's MSJ.[3] Therefore, parasailing within 100 yards is presumed to be a taking by harassment, while parasailing outside the 100–yard perimeter is not a taking by harassment under federal law. Because the state law relates to boating within 100 yards of a whale, it also relates to a taking. The Hawaii parasailing restriction is therefore expressly preempted by the plain text of 16 U.S.C. § 1379(a). *See People of Togiak v. United States*, 470 F.Supp. 423 (D.D.C.1979) (noting that § 1379 "deals with the entire subject matter of State regulation of the taking of marine mammals and with federal-State cooperation in this area").

The State argues that, if the court looks beyond the plain text of the MMPA, the court must conclude that the MMPA does not preempt the seasonal parasailing ban. First, the State contends that preempting state laws that afford added protection to marine mammals eviscerates the purpose of the MMPA. Reply at 8. Second, the State argues that the Endangered Species Act ("ESA"), passed a year after the MMPA, implicitly repealed the preemption provision of the MMPA, allowing states to strengthen federal protections for marine mammals. Reply at 5. Neither argument is convincing.

2.  *The Legislative History of the MMPA Does Not Justify Ignoring the Plain Language of the Text.*

■ In interpreting the meaning of a statute, a court must first look to the text of the statute. The plain language of a statute will control unless: (1) the statutory language is unclear; (2) the plain meaning of the words is at variance with the policy of the statute as a whole, or (3) a clearly expressed legislative intent exists contrary to the language of the statute. *City of Edmonds v. Washington State Bldg.Code Council,* 18 F.3d 802, 804 (9th Cir.1994); *see also Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("Absent a clearly expressed legislative intention to the contrary," statutory language is conclusive.); *but see United States v. Ibarra–Galindo,* 206 F.3d 1337, 1341, n. 2 (9th Cir.2000) ("this court steadfastly abides by the principle that legislative history—no matter how clear—can't override statutory text").

The State contends that the legislative history of the MMPA shows that the

**3.** This amendment is discussed at greater length in the section addressing an actual

conflict with federal law.

MMPA was not intended to preempt state measures protecting marine mammals. *See State v. Arnariak*, 941 P.2d 154 (Alaska 1997) (holding that the MMPA did not preempt a state law requiring a permit to enter a walrus sanctuary and forbidding discharge of a firearm in the sanctuary). The State notes that the primary objective of the MMPA is to "prohibit the harassing, catching and killing of marine mammals." H.R.Rep. No. 92–707(1972), *reprinted in* 1972 U.S.C.C.A.N. 4144, 4144. Moreover, the legislative history indicates that. there was "no intention or desire within the [House] Committee to remove any incentive from the states to carry out necessary research or to protect animals residing within their jurisdictions." *Id.* at 4151.

The State's reliance on the legislative history is misplaced. The text of § 1379(a) unambiguously preempts any state law relating to the taking of a marine mammal unless authority over that animal has been transferred to that state. In the absence of a transfer, the court enforces the statutory language providing that "No State may enforce, or attempt to enforce, any State law or regulation relating to the taking" of whales.

Even if this court considered legislative history as informing its reading of the unambiguous federal statute, that history would not justify the state law before this court. That history, like the text of the MMPA, makes it clear that the MMPA was intended to preempt state laws relating to the taking of marine mammals, except when there are transfers of authority. *Id.* at 4161. The MMPA seeks to establish a "unified integrated system of management for the benefit of animals," and the House Report says that a unified system can only be achieved through federal-state cooperation, not independent state regulation. *Id.*

In urging consideration of the MMPA's legislative history, the State relies on the reference in the House Report to an intent not to remove incentives the states had for protecting animals. However, that reference is preceded by the statement that "The bill permits and indeed requires the development of an extensive management program in the agencies concerned, with full opportunity for *cooperative federal-state* management programs designed to carry out the purposes and policies of the act." *Id.* (emphasis added).

Congress envisioned cooperation by the states with the federal government; Congress did not leave the states free to act independent of the federal government. *See Arnariak*, 941 P.2d at 162 (Shortell, J., dissenting). In the MMPA, Congress put the federal government in control of matters relating to the taking of marine mammals, recognizing that other policy considerations might at times trump the protection of marine mammals. *See e.g., People of Togiak*, 470 F.Supp. 423 (concerning Native Alaskan hunting rights); *see also Fouke Co. v. Mandel*, 386 F.Supp. 1341, 1357 (D.Md.1974) (noting that countervailing considerations, environmental and otherwise, led Congress to reject an absolute ban on taking marine mammals).

General exhortations in the legislative history stating that the MMPA was meant to protect marine mammals cannot override the plain text of the statute. Moreover, careful review of the legislative history demonstrates that Congress meant exactly what it said regarding preemption of state laws enacted in the absence of a transfer of authority.

3. *The ESA Did Not Repeal the Preemption Provision of the MMPA.*

a. *By Its Plain Text, the ESA is Consistent iwith the MMPA.*

The State argues that § 1379(a) of the MMPA "has been overridden by a subsequent, far more restrictive and broad

reaching federal law," the ESA. Reply at 5. The ESA permits states to adopt laws supplementing federal protection of endangered species. The ESA provides, at 16 U.S.C. § 1535(f):

> Any State law or regulation which applies with respect to the importation or exportation of, or interstate or foreign commerce in, endangered species or threatened species is void to the extent that it may effectively (1) permit what is prohibited by this chapter, or (2) prohibit what is authorized pursuant to an exemption or permit provided for in this chapter or in any regulation which implements this chapter. This chapter shall not otherwise be construed to void any State law or regulation which is intended to conserve migratory, resident, or introduced fish or wildlife, or to permit or prohibit sale of such fish or wildlife. Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in this chapter or in any regulation which implements this chapter but not less restrictive than the prohibitions so defined.

The ESA contemplates the possibility of conflicts between the ESA and the MMPA. Section 1543 in the ESA states: "Except as otherwise provided by this chapter, no

provision of this chapter [the ESA] shall take precedence over any more restrictive conflicting provision of the Marine Mammal Protection Act of 1972."

The State contends that there is a conflict between the MMPA provision that preempts all state laws relating to the taking of marine mammals and the ESA provision that permits state laws to supplement federal protections. Reply at 5. According to the State, because the ESA provision allows for greater protection of animals and therefore is more restrictive than the MMPA, the ESA prevails over the MMPA in the event of a conflict.

UFO argues that the more restrictive statute is not the one providing greater protection to an endangered species, but the one whose preemptive force restricts states more. UFO notes that the MMPA has stronger preemption provisions and is therefore more restrictive than the ESA. In the alternative, UFO argues that the more restrictive statute is the one that can be enforced by a more limited group. As the MMPA does not contain provisions like those in the ESA permitting suits by private parties (as opposed to suits only by the federal government) to enforce the ESA, UFO says, again, that the MMPA is more restrictive than the ESA and therefore takes precedence over the ESA.[4] Mot. At 7; Reply at 11.

4. While § 1543 states that no provision of the ESA will take precedence over a more restrictive provision of the MMPA, § 1543 does not state that a less restrictive provision of the MMPA must give way to a more restrictive provision of the ESA. However, Congress may have intended that the more restrictive provision of either the MMPA or the ESA prevail in the event of a conflict. *See* H.R. Conf. Rep. 93–740 (1973) *reprinted in* 1973 U.S.C.C.A.N. 3001, 3007 (when there is a conflict between the ESA and the MMPA, "the stricter of the two will prevail"); *see also Strahan v. Coxe*, 127 F.3d 155, 161 (1st Cir.1997) (§ 1543 prevents "anyone from arguing that the less restrictive requirements of one state supersede the more restrictive requirements of the other").

The State contends that *Strahan* supports its argument that the "plain meaning" of § 1543 is that the MMPA's preemption provision is no longer in effect. Reply at 7. However, as the State conceded at the hearing on these motions, *Strahan* did not concern preemption. Moreover, the First Circuit rejected the suggestion that § 1543 incorporates the MMPA into the ESA. For that reason, Strahan held that the citizen suit provision in the ESA did not apply to the MMPA. 127 F.3d at 161. Similarly, § 1543 does not incorporate the ESA's provision concerning state protections into the MMPA.

UFO's arguments as to which laws are more restrictive are meritless. Nothing in § 1543 suggests that Congress was referring to the preemptive power or to the scope of enforcement authority of the two statutes when it referred to conflicts between the MMPA and the ESA. In passing the ESA, Congress sought to strengthen environmental protection laws. *See Tennessee Valley Auth. v. Hill,* 437 U.S. 153, 180, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). More restrictive laws provide more environmental protection.

■ While the court agrees with the State that the more restrictive provisions referred to in the ESA are those that provide greater environmental protection, the court does not agree with the State that this interpretation creates a conflict between the ESA's provision allowing more protective state laws and the MPAA's provision preempting state laws relating to the taking of marine mammals. Section 1535(f) in the ESA narrows the preemptive effect of only the ESA. The relevant portion of § 1535(f) states: "Any State law or regulation respecting the taking of an endangered species or threatened species may be more restrictive than the exemptions or permits provided for in *this chapter,*" but not less restrictive. (Emphasis added.) Section 1535(f) thus concerns only provisions within the ESA. Given the lack of effect on the MMPA, nothing in the ESA can be said to supersede the MMPA's preemptive effect.

b. *The ESA's Legislative History Establishes No Clear Congressional Intent to Repeal the MMPA's Preemption Provisions.*

■ The State's argument that the ESA supersedes the MMPA's preemption provision is an argument that Congress impliedly repealed § 1379 of the MMPA. But repeals by implication are not favored in the absence of a clearly expressed congressional intent. *Branch v. Smith,* 538 U.S. 254, 273–74, 123 S.Ct. 1429, 155 L.Ed.2d 407 (2003). "An implied repeal will only be found where provisions in two statutes are in irreconcilable conflict, or where the latter act covers the whole subject of the earlier one and is clearly intended as a substitute." *Id.* (citations omitted); *see also Topa Equities, Ltd. v. City of Los Angeles,* 342 F.3d 1065, 1069 (9th Cir.2003) (rejecting the argument that an express preemption provision in low income housing legislation had been impliedly repealed, given the lack of a clear intent to repeal or an irreconcilable conflict with any other federal law). As this court noted above, there is no irreconcilable conflict between the plain terms of the ESA and the plain terms of the MMPA. Nor has the court found any indication of a clear legislative intent to repeal the MMPA's preemption provision.

The State's argument as to what Congress intended in passing the ESA rests on the following statement in the House Report regarding the ESA:

> The Senate bill contained a section which stated that, wherever a conflict between the Endangered Species Act and the recent Marine Mammal Protection Act might occur, the stricter of the two will prevail. This would allow, for example, state regulation of the taking of marine mammals, once these were declared endangered or threatened, without the state having a fully approved marine mammal program, as it would otherwise be required to do under the Marine Mammal Protection Act. The House accepted the Senate provisions.

H.R. Conf. Rep. 93–740 (1973), *reprinted in* 1973 U.S.C.C.A.N. 3001, 3007.

Read in isolation, this single paragraph of legislative history does indeed indicate that Congress intended to allow state regulation that would otherwise be preempted

by the MMPA, effectively repealing § 1379, which requires the state to obtain a federal transfer of authority before adopting laws relating to the taking of marine mammals. But the court must consider this paragraph, written in 1973, in the context of other indications of congressional intent. The strongest indications that Congress intended to preserve the preemptive scope of the MMPA are the amendments Congress made to the MMPA in 1981 and 1994. In leaving intact the preemption provision in § 1379 in 1981 and 1994, Congress demonstrated unequivocally that, in passing the ESA in 1973, it had not intended to repeal § 1379 in the MMPA.

The amendments to the MMPA made in 1981 included amendments to § 1379.[5] The amendments primarily elaborated on the procedures by which authority could be transferred to the states. The text of the preemption provision was altered slightly, but its basic prohibition of state laws relating to the taking of marine mammals remained unchanged. The 1981 amendment was therefore a reaffirmation of the preemptive scope of the MMPA and clearly established that the ESA had not eviscerated the preemptive effect of the MMPA.

Even if the ESA had repealed § 1379 in 1973, when the ESA was enacted, an amended version of § 1379 was passed in 1981, again broadly preempting state laws. The ESA could hardly have repealed the 1981 version of § 1379. Moreover, section 4 of the House Report on the 1981 amendments makes clear that the purpose of the amendments was to "provide that no state may enforce, or attempt to enforce, any

law or regulation relating to the taking of any marine mammals except as provided by" cooperative agreements transferring authority. H.R.Rep. No. 97–228, at 22 (1981), reprinted in 1981 U.S.C.C.A.N. 1458, 1472. In the final sentence of this section, the Committee "notes" that section 17 of the ESA (16 U.S.C. § 1543) states that when there is a conflict between the ESA and the MMPA, the more restrictive provision applies. The Committee then goes on to say that nothing in the 1981 amendments is "intended to alter that result." Id. at 30, 1981 U.S.C.C.A.N. at 1480.

The 1994 amendments to the MMPA further show that the MMPA preempts state laws relating to the taking of marine mammals. The legislative history of the 1994 amendments indicates that Congress understood the preemptive power of the MMPA as remaining in effect. In discussing background information about the MMPA, the Senate Report states, "The MMPA establishes a comprehensive Federal program to conserve marine mammals, preempting State management authority." S. Rep. 103–220, at 2 (1994), reprinted in 1994 U.S.C.C.A.N. 518, 519. The Report continues, "While the MMPA preempts State authority over marine mammals, it also establishes procedures though which States may regain that authority, together with Federal financial assistance for carrying out an approved State program." Id. The legislative history indicates that a state wishing to enact laws relating to the taking of marine mammals, such as the Hawaii parasailing law, must seek approval from or cooperate with

---

**5.** Prior to the 1981 amendment, § 1379(a)(1) stated, "Except as otherwise provided by this section, no State may adopt any law or regulation relating to the taking of marine mammals within its jurisdiction or attempt to enforce any State law or regulation relating to

such taking." Section 1379(a)(2) said that states could adopt and enforce regulations relating to the taking of marine mammals with the review and approval of the Secretary of Commerce. 16 U.S.C. § 1379 (1980), amended by 16 U.S.C. § 1379 (1981).

the federal government. The MMPA does not allow states to implement such laws independent of the federal government.

Looking at the legislative history of the ESA and MMPA as a whole, the court sees no reason to conclude that the ESA repealed the MMPA. With neither an irreconcilable conflict between the ESA and the MMPA nor a clear indication from Congress that it intended the ESA to repeal § 1379 in the MMPA, this court concludes that the § 1379 remains in full force and effect in the face of the ESA. Had Congress intended § 1543 in the ESA to alter the preemptive effect of the MMPA, Congress would surely have given some affirmative indication of this intention, rather than making an oblique reference in a catch-all provision governing conflicts between statutes.

### B. *The Parasailing Regulation Actually Conflicts with Federal Law Allowing Boats to Approach Within 100 Yards of Whales.*

In the preceding discussion, the court has addressed how the MMPA expressly preempts the State's seasonal parasailing ban. But there is another form of preemption applicable to the seasonal parasailing ban that renders that ban unconstitutional. The seasonal parasailing ban actually conflicts with a substantive right provided by section 17 of the MMPA Amendments of 1994, titled "Human Activities Within Proximity of Whales." [6] Section 17 states that it is lawful "to approach, by any means other than aircraft, no closer than 100 yards to a humpback whale." Pub.L. No. 103–238, 1994 Stat 1636.[7] Therefore, federal law specifically authorizes UFO to approach, by any means other than aircraft, no closer than 100 yards to a whale.[8] Because parasail-

---

**6.** Section 17 of the Marine Mammal Protection Act Amendments of 1994 states in full:

(a) LAWFUL APPROACHES—In waters of the United States surrounding the State of Hawaii, it is lawful for a person subject to the jurisdiction of the United States to approach, by any means other than aircraft, no closer than 100 yards to a humpback whale, regardless of whether the approach is made in waters designated under section 222.31 of title 50, Code of Federal Regulations, as cow/calf waters.

(b) TERMINATION OF LEGAL EFFECT OF CERTAIN REGULATIONS—Subsection (b) of section 222.31 of title 50, Code of Federal Regulations, shall cease to be in force and effect.

**7.** Section 17 was not included as an enumerated statutory section in the United States Code. It was merely attached as a note to 16 U.S.C. § 1538. It is not clear why this substantive provision, once passed by Congress, was put only into the note form more often used for nonsubstantive matters. Congress may have attached this substantive provision as a note because the provision dealt with a regulation, rather than a statutory provision. Section 17 expressly terminated a provision of the Code of Federal Regulations. Given the express congressional statement allowing

an approach no closer than 100 yards to a whale, NOAA adopted a new regulation. *See* 50 C.F.R. § 922.184. Under these circumstances, the regulation authorizing an approach no closer than 100 yards appears to carry the weight of a statute. Congress itself established the 100–yard rule, rather than passing a general statute and leaving it to the agency to determine the precise distances with which to implement the statute.

**8.** The State has not argued that a parasail is an aircraft. A parasail involves an unmotorized flying device akin to a parachute that may be attached by strings or lines to a boat. A parasail is often designed to hold a person aloft. As the boat moves through the water, it pulls the parasail with its passenger through the air. Clearly, airplanes must stay farther away from whales than boats must. *See* 15 C.F.R. § 922.184(b) (prohibiting, with certain exceptions operation of an aircraft within 1,000 feet of the whale sanctuary). No party here argues that a parasail should be deemed an aircraft and therefore prohibited from coming within 1000 feet of the whale sanctuary. *But see United States v. Red Frame Parasail,* 160 F.Supp.2d 1048, 1055 (D.Ariz.2001) (holding that a parasail is considered an "aircraft" under the provisions of the Airborne Hunting Act).

ing is authorized, any state law prohibiting parasailing more than 100 yards from a whale is in actual conflict with the federal authorization to approach within 100 yards and is preempted.[9]

The court recognizes the Hawaii Legislature's laudable goal in passing the seasonal parasailing ban. Clearly, the State was seeking to increase protections for an endangered species in Hawaiian waters. Unfortunately, the State employed an unconstitutional method of achieving its goal. There is no evidence in the record that the federal government has transferred authority to the State with respect to how far from humpback whales boats must stay. The seasonal parasailing ban imposed by state law therefore actually conflicts with federal law and is preempted.

## V. CONCLUSION.

UFO's motion for summary judgment is granted, and the State's motion for summary judgment is denied. Section 200–37(i) of Hawaii Revised Statutes and all rules and regulations derived from that statute are declared unconstitutional.[10]

IT IS SO ORDERED.

---

**9.** Though section 17 amended the MMPA, it was placed as a note to 16 U.S.C. § 1538, *see* Pub.L. No. 103–238, 1994 Stat. 1636, which is part of the ESA, not the MMPA. Even if the provision allowing an approach within 100 yards is part of both the ESA and the MMPA, the analysis above does not change. *See* 15 C.F.R. § 922.184(a)(1) (deeming the prohibition on approaching within 100 yards as deriving from the MMPA and the ESA). Though the ESA, unlike the MMPA, allows states to supplement federal environmental regulations, even under the ESA a state may not prohibit what is expressly authorized by the ESA. 16 U.S.C. § 1535(f). Therefore, once Congress says that one can lawfully approach no closer than 100 yards from a whale, a state cannot pass, even under the ESA, a regulation proscribing such activity. While 15 C.F.R. § 922.183(a) says that "All activities are also subject to all prohibitions, restrictions, and conditions validly imposed by any other Federal, State, or county authority of competent jurisdiction," the parasailing regulation is not *validly* imposed because it conflicts with substantive federal law.

**10.** The only issue remaining in this case is the request in UFO's pleadings for a permanent injunction. A permanent injunction may be a foregone conclusion based on the present order, but UFO has not yet moved for a permanent injunction. Therefore, the court does not issue an injunction at this time, and the case file remains open.